[Cite as *Basel v. Schlarb*, 2026-Ohio-1918.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

THOMAS A. BASEL, INDIVIDUALLY
AND AS EXECUTOR OF THE
ESTATE OF FLORENCE I. BASEL
a.k.a. FLORENCE ISABELLE BASEL,

        Plaintiff-Appellee,

        - vs -

LORI SCHLARB,

        Defendant-Appellant.

CASE NO. 2025-P-0031

Civil Appeal from the
Court of Common Pleas,
Probate Division

Trial Court No. 2023 CV 00006

---

## OPINION AND JUDGMENT ENTRY

Decided: May 26, 2026
Judgment: Reversed and remanded

---

*H. Gilson Blair,* Law Office of H. Gilson Blair, Ltd., 154 North Park Avenue, Warren, OH 44481, *Carol A. Sopkovich* and *James J. Crisan*, Martin F. White Co., L.P.A., 156 Park Avenue, N.E., P.O. Box 1150, Warren, OH 44482 (For Plaintiff-Appellee).

*Laura L. Mills* and *Pierce C. Walker*, Mills, Mills, Fiely & Lucas, L.L.C., Mills Historic Tower, 101 Central Plaza South, Suite 1200, Canton, OH 44702 (For Defendant-Appellant).

JOHN J. EKLUND, J.

{¶1} Appellant, Lori Schlarb, appeals the judgment of the Portage County Court of Common Pleas, Probate Division, finding her guilty of concealment of assets of the estate of Florence Isabelle Basel (Florence) pursuant to R.C. 2109.50 as brought by Appellee, Thomas A. Basel, Individually and as Executor of the Estate of Florence I. Basel.

{¶2}    Appellant has raised two assignments of error arguing that the trial court erred by: (1) finding Appellant guilty of concealment and (2) failing to provide a computation of damages.

{¶3}    Having reviewed the record and the applicable caselaw, we find Appellant's first assignment of error has merit. The trial court incorrectly concluded that Appellant's conduct amounted to concealment as contemplated under R.C. 2109.50 and 2109.52. Those statutes apply only to property a decedent owned under law upon her death. Florence did not own the assets at issue here upon her death, and no exception to that rule that we have recognized applies. As a result of that conclusion, Appellant's second assignment of error is moot. Therefore, we reverse the judgment of the Portage County Court of Common Pleas, Probate Division, finding Appellant guilty of concealment and subsequently assessing damages and attorney fees. We remand this matter for further proceedings.

**Substantive and Procedural History**

{¶4}    Florence died on December 17, 2019. Appellant is Florence's daughter, and Appellee is Florence's son. Appellee was named as the executor of the estate.

{¶5}    On March 31, 2023, Appellee filed a Complaint for Concealment of Assets.

{¶6}    Appellee later filed an Amended Complaint for Concealment of Assets on June 20, 2024. Both pleadings sought relief under "R.C. 2109.50, et seq.," alleging that Appellant concealed, embezzled, or conveyed away certain assets that belonged to Florence's estate.

{¶7}    On June 21, 2024, Appellant filed her Answer.

{¶8}    The trial court held a trial over the course of July 26, 2024, September 6, 2024, and October 11, 2024. The proceedings were bifurcated in accordance with R.C. 2109.52, with the trial court rendering a verdict and, if necessary, holding a hearing to assess damages. The following evidence was adduced at the guilt phase of the trial:

{¶9}    In 2011, Florence's health worsened, and she began living with Appellant part-time. Over time she became unable to manage her own financial affairs. Appellant became Florence's attorney-in-fact on September 25, 2012, when Florence granted Appellant healthcare and a general Power of Attorney (POA). Appellant used the POA to manage Florence's assets.

**Home Savings Bank Account:**

{¶10}   Appellant testified that as holder of the POA she learned Florence had an existing account at Home Savings Bank with approximately $72,000.00 in it. Appellant took all of the money out of the account and "gave it to" her husband, Mark Schlarb, because "[h]e was the primary bill payer." She said the money was deposited into Mark's business checking account and that the money was used to pay for Florence's care. However, Appellant did not keep any documents to show how the money from the Home Savings Account was spent. Mark admitted that he deposited the $72,000.00 in his business checking account.

{¶11}   Appellant said that she used the $72,000.00 in the Home Savings Bank account to "care for" Florence and get her "any supplies, any food, anything she needed she got. Anything."

{¶12}   Florence began living with Appellant full time in 2014. At that time, Appellant used $20,836.00 of Florence's money to redo a bedroom in Appellant's home that

Florence used. Appellant produced receipts demonstrating that she paid a contractor approximately $15,000.00. She also testified that Appellee, who owned a carpet store, installed the carpet at the cost of $3,000.00 to $4,000.00.

**Chase Bank Account:**

{¶13} In 2014, Florence sold her house for $282,159.17. Appellant opened a Chase Bank account in Florence's name and deposited the money from the sale of the house into that account. Appellant routinely wrote checks to cash and could not account for what she did with the money from specific checks. Although she testified that she believed that she had written the checks to pay for home healthcare costs, she said that she did not have supporting documentation.

**Florence's In-home Healthcare:**

{¶14} Florence's condition required in-home healthcare assistance. Appellant said that she wrote numerous checks for cash, which she signed and endorsed for the purpose of paying Florence's in-home healthcare workers. She said that she did not keep records of these payments. Appellant did not have any documentation of in-home healthcare prior to September 2016. After September 2016, Appellant had records of worker schedules but still did not maintain documentation of her expenditures. However, Appellant testified that the money was used to care for Florence or for her direct benefit.

{¶15} Appellant said that Mark drew from the $72,000.00 that she gave to him to pay for Florence's health care expenses, and later she used the money from the Chase Bank account. Appellant paid the healthcare workers in cash and did not issue 1099s to the workers.

{¶16} Appellant said that Florence had in-home care for 12 hours a day, seven days a week. Bank records from February 2015 showed that Appellant withdrew approximately $10,000.00 per month to pay for in-home healthcare. However, her best recollection of the cost of the care only accounted for approximately $5,000.00. She said the remaining money was spent on food, appointments, "everything." However, she did not have receipts for any expenditures. Similarly, bank records from April 2015 showed approximately $16,500.00 of withdrawals made out to cash, and May 2015 totaled approximately $22,000.00. Appellant could not specifically answer how she spent the money. In explaining how she used the weekly cash withdrawals, Appellant said that "[w]hat was not used in that week was put in a safe location for later use." She later clarified that the money was put into a physical safe and said, "if I couldn't get down to the bank due to my work, I could go down, I could take out, and I could pay people." Appellant could not explain with particularity how the extra withdrawals were used. She denied having any leftover cash at the time Florence died.

{¶17} Several of Florence's caregivers testified that they were paid in cash, did not have records for how much they had been paid, and did not report the income on their taxes. The caretakers themselves had not kept records of their pay. One healthcare worker testified that she was paid $15.00 an hour in cash and that she worked approximately 30-35 hours a week for the three years she cared for Florence. She did not report any of this income. A second healthcare worker testified that he provided in-home care to Florence between 2016 and 2018, at which time Florence entered a nursing home. He worked four-hour shifts, three days a week. He could not specifically remember how much he was paid per hour. Lanora Hackathorn testified that she cared for Florence for

Case No. 2025-P-0031

two weeks in February 2014 while Appellant and Mark were out of town. She said she was paid $2,450.00 in cash and considered the payment as a gift.

{¶18} Beverly Riggenbac, Appellant's accountant, testified that she advised Appellant about Florence's taxes. She told Appellant that if Florence's only income was Social Security, then she did not need to complete a tax return for Florence. She did not believe that she ever prepared a tax return for Florence.

{¶19} Riggenbac said that she prepared tax returns for Appellant and received information from Appellant to assist her. Riggenbac said that Appellant was taking funds from Florence's accounts, considering that as income, and claiming healthcare expenses from that income. Appellant reported all of this on her 1040 Schedule C tax forms. However, Riggenbac said that Appellant provided "summaries" of what she had paid out of Florence's assets to pay contractors, bills, and for Florence's care.

{¶20} Although Appellant's tax forms were entered into evidence, Appellant did not offer the summaries of the expenses as evidence. Riggenbac characterized the documentation to support the summaries as a "listing" and did not recall there being any bank statements or check ledgers to support the summarization. She described this level of documentation as typical. Riggenbac said that she did not have any record that money came from Florence or any of Florence's accounts to Mark. She said that she did not similarly record income from Florence to Mark in Mark's 1040 Schedule C for his business.

{¶21} Riggenbac said that she advised Appellant to keep records of Florence's expenses and to account for every penny. She denied telling Appellant to withdraw double the amount of cash to pay for caregivers and to place the excess in the home safe.

Riggenbac said that Appellant "didn't have the information to provide 1099's" to caregivers because "they were cash, and they did not provide the information. But yes, we talked about 1099's."

{¶22} Florence moved out of Appellant's house in 2019 and moved into a nursing home.

**Florence's Death and Estate:**

{¶23} Florence died on December 17, 2019. Appellee testified that after Florence died, he was made the executor of her estate. He said that he requested the necessary records to proceed with the estate. He said that her estate had approximately $9,000.00 and a ring. When asked if he had any evidence or documentation to show that Appellant had concealed assets, he said he did not. However, he said his concern was that Appellant was not able to show how she had spent Florence's assets as her attorney-in-fact. He did acknowledge "a lot of truth" in what Appellant offered for explaining how monies had been used for Florence's care but said he was unable to complete his role as executor without proper documentation. He said that Appellant's lack of tax forms, receipts, under-the-table payments, checks made out to cash, and poor recordkeeping made his role as executor impossible to complete. He said that the issue was not so much about hidden assets but about "delegated spending" rather than a false placement of spending. He said that he did not think there was any money that Appellant had hidden but that she should have kept better records and been more responsible as the attorney-in-fact.

**Decision and Verdict:**

Case No. 2025-P-0031

{¶24} On December 4, 2024, the trial court issued its Decision and Verdict on the first phase of the concealment action. The trial court determined that Appellant and Mark had "personally benefitted from the use of Florence's money while she was incapacitated due to dementia." The trial court further concluded that Appellant had a fiduciary relationship with Florence because she acted as her attorney-in-fact. The trial court cited R.C. 1337.34(B), which sets forth the mandatory duties of an attorney-in-fact. One of the mandatory duties pursuant to R.C. 1337.34(B)(4) is to "[k]eep a record of all receipts, disbursements, and transactions made on behalf of the principal."

{¶25} The trial court determined that under *Rudloff v. Efstathiadis*, 2003-Ohio-6686 (11th Dist.), a probate court has jurisdiction over a concealment action brought pursuant to R.C. 2109.50 to recover funds in the possession of a third party by inter vivos transaction where the validity of the underlying transaction is challenged.

{¶26} The trial court found that Appellant conveyed money away from Florence's estate while she was incapacitated; that Appellant acted as Florence's attorney-in-fact and gave Mark $72,000.00 from Florence's estate; that Appellant failed to keep records of transactions regarding her use of $282,159.17 from the sale of Florence's house; that Appellant failed to rebut the presumption that she had not engaged in improper self-dealing and undue influence; that Appellant acted in bad faith and was self-dealing with Florence's estate assets; and that Appellant's conduct was willful and intended to conceal, embezzle, and convey away assets that belong to Florence's estate.

{¶27} Therefore, the trial court found Appellant "guilty of having concealed, embezzled, conveyed away, or of being or having been in the possession of monies and

Case No. 2025-P-0031

other property that was owned by Florence I[.] Basel and now belongs to her Estate." The trial court set the matter for a separate hearing to determine damages.

**Damages:**

{¶28} On January 17, 2025, the trial court held a damages hearing. The trial court said that it would consider the evidence already received during the first phase of the proceedings. Appellant's counsel deferred to the trial court to rely on the evidence from the first phase of the concealment action to calculate the damages. Appellee's counsel expressed the position that Appellee was "seeking the entire amount. It's our understanding that we have refused the entire amount. But I think that's been the consistent argument for the three days of trial. They want everything, we're saying none. And obviously we would stipulate that. We don't need to represent that. We would just rest on what's already been presented." In addition, Appellee presented evidence of attorney fees.

{¶29} On May 9, 2025, the trial court issued a Judgment Entry on damages. The trial court said that there was no dispute that Appellant closed Florence's Home Savings Bank account and gave the $72,000.00 from the account to her husband Mark, who deposited the money into his business checking account. Both Appellant and Mark failed to maintain records showing how that money was used for the benefit of Florence.

{¶30} The trial court determined that Appellant used the POA to open a checking and savings account at Chase Bank. This account was used to deposit Florence's Social Security checks and to deposit $282,159.17 from the sale of Florence's home. Appellant gave Mark more than $20,000.00 from the proceeds of the sale. The trial court said that neither Mark nor Appellant kept records of how that money was used.

Case No. 2025-P-0031

{¶31} The trial court found that Appellant had admitted that she had exclusive control of Florence's Chase Bank account. Appellant admitted that she expended the remaining funds in the account through cash withdrawals and checks made out to either cash or to herself. Appellant failed to keep records of how she used these withdrawals and checks made out to cash or herself.

{¶32} The trial court said that Appellant testified that she used Florence's money to pay for caregivers and that any excess cash was placed in Appellant's home safe. However, she did not keep any records to this effect. Although caregiver testimony and Appellant's exhibits demonstrated that Florence did receive in-home healthcare, the records did not establish how much was paid. The caregivers were paid in cash and did not report the income and could not remember how much they had been paid.

{¶33} The trial court also found that Appellant's accountant could not corroborate Appellant's testimony that she was instructed to put excess money in the home safe for future expenses.

{¶34} The trial court found by a preponderance of the evidence that Appellant had

Concealed, embezzled, or conveyed away $72,000.00 from Florence's Home Savings Bank account and $251,275.00 of Florence's money from the Chase Bank account. The Court further finds that [Appellant] willfully, wantonly, and wrongfully. . . acted in bad faith by concealing the sum of $323,275.00 that belongs to the Estate of Florence I[.] Basel.

{¶35} The trial court issued a ten percent penalty for a total amount of $355,602.50.

{¶36} The trial court also ordered that Appellant be held responsible to pay the costs of the hearing and transcript expenses; the investigation and associated expenses necessary for the estate to correct any damage caused by Appellant's self-dealing;

Case No. 2025-P-0031

Appellee's attorney fees and authorized expenses; and fiduciary commissions, extra-ordinary charges and expenses. On May 16, 2025, the trial court granted Appellee's motion for attorney fees and expenses in the amount of $15,076.07 and ordered Appellant to pay costs in the amount of $2,133.16 in addition the previously ordered $355,602.50.

{¶37} Appellant timely appealed raising two assignments of error.

**Assignments of Error and Analysis**

{¶38} Appellant's first assignment of error states: "The Trial Court committed prejudicial error when it found Appellant guilty of concealment."

{¶39} We first consider whether the trial court had subject matter jurisdiction to reach the merits of Appellee's concealment claim.

{¶40} "The general term 'jurisdiction' can be used to connote several distinct concepts, including jurisdiction over the subject matter, jurisdiction over the person, and jurisdiction over a particular case." *Bank of Am., N.A. v. Kuchta*, 2014-Ohio-4275, ¶ 18. "Subject-matter jurisdiction is the power of a court to entertain and adjudicate a particular class of cases." *Id.* at ¶ 19. However, "[a] court's jurisdiction over a particular case refers to the court's authority to proceed or rule on a case that is within the court's subject-matter jurisdiction." *Id.* "This latter jurisdictional category involves consideration of the rights of the parties. If a court possesses subject-matter jurisdiction, any error in the invocation or exercise of jurisdiction over a particular case causes a judgment to be voidable rather than void." *Id.*

{¶41} "Probate courts are courts of limited jurisdiction, and probate proceedings are thus restricted to those actions permitted by statute and by the Ohio Constitution." *Pollnow v. Polivka*, 2023-Ohio-2830, ¶ 24 (11th Dist.). "'[I]t is settled law that subject

Case No. 2025-P-0031

matter jurisdiction cannot be conferred on a court by consent of the parties, nor can it be waived.'" *Kraus v. Hanna*, 2004-Ohio-3928, ¶ 35 (11th Dist.), quoting *In re Estate of Vitelli*, 110 Ohio App.3d 181, 184 (2d Dist. 1996).

{¶42}  Appellee's claim involved R.C. 2109.50, which provides in pertinent part:

> Upon complaint made to the probate court . . .  by a person interested in the estate, testamentary trust, or guardianship . . .  against any person suspected of having concealed, embezzled, or conveyed away or of being or having been in the possession of any moneys, personal property, or choses in the action of the estate, testamentary trust, or guardianship, the court shall . . .  compel the person or persons suspected to appear before it to be examined, on oath, touching the matter of the complaint.

{¶43}  A proceeding under R.C. 2109.50 is a special statutory proceeding "of a summary and inquisitorial character and is quasi criminal in nature." *In re Estate of Fife*, 164 Ohio St. 449 (1956), paragraph one of the syllabus.

{¶44}  The proceedings are designed to expedite the administration of estates through a summary method of discovering assets that belong in the estate. *Id.* at 453. The probate court is required to cite the person suspected of concealment to appear before the court for examination, under oath. *Id.* The proceeding is designed as a "discovery proceeding" conducted by the probate court and "is not a proceeding between two or more parties as is the ordinary civil action with pleadings . . . ; it is rather an inquest or inquiry into the conduct of the 'suspected persons.'" *Id*. at 454. "The complaint directs the court's attention to the alleged misconduct and then the court on the complaint alone is required to investigate the charge and take appropriate action in accordance with the evidence disclose[d]." *Id*. The court is "in control of the examination," but the court may delegate to the attorneys the conduct of the examination. *Id.* The suspected person is "in

Case No. 2025-P-0031

reality the witness of the court, and the character and extent of his [or her] examination rest largely in the court's discretion." (Citation omitted) *Id.*

{¶45} "A concealment action is . . . the proper tool to recover assets or money taken from an estate." *Harrison v. Faseyitan*, 2004-Ohio-6808, ¶ 29 (7th Dist.). However, actions under R.C. 2109.50 are "not intended as a substitute for a civil action to collect a debt, obtain an accounting, adjudicate rights under a contract or recover judgment for money owing an executor or administrator." *Wozniak v. Wozniak*, 90 Ohio App.3d 400, 407 (9th Dist. 1993).

{¶46} The focus of the inquiry is

> on the ownership of the asset and whether possession of the asset is being impermissibly concealed or withheld from the estate. Thus, a plaintiff has stated an actionable cause under R.C. 2109.50 if he alleges that the asset is the exclusive property of the estate and that the defendant has unauthorized possession of the asset or in some way has impermissibly disposed of it.

*Id.*

{¶47} This two-pronged analysis is a question of fact and law. *See In re Estate of Ohman*, 2023-Ohio-4008, ¶ 41-42 (6th Dist.). The first prong—whether the asset is the exclusive property of the estate—is a question of fact that must be established by a preponderance of the evidence. *Ohman* at ¶ 40-41. The second prong—whether the defendant has unauthorized possession or impermissibly disposed of it—is a question of law. *Id.* at ¶ 40, 42.

{¶48} Under this standard,

> if a defendant takes a person's money before death or before institution of a guardianship, then a concealment action is not the appropriate remedy because the money was not taken from the estate; rather, it was taken from an individual before the existence of an estate. *On the other hand, if a defendant takes a person's money after that person died or after that person became a ward, meaning that an estate was in existence at the time the money was taken*, then a concealment action is proper.

Case No. 2025-P-0031

(Emphasis added.) *Harrison*, 2004-Ohio-6808, at ¶ 30 (7th Dist.).

**{¶49}** The above are the general rules that apply to the probate court's jurisdiction in concealment actions brought under R.C. 2109.50. In this case, the trial court relied on *Rudloff v. Efstathiadis*, 2003-Ohio-6686 (11th Dist.), for an exception to the general rule described above. We conclude that the trial court, relying on the exception set for in *Rudloff*, did have subject matter jurisdiction to adjudicate this class of claim. However, the evidence in this case demonstrates that the exception set forth in *Rudloff* is inapt here.

**{¶50}** *Rudloff* involved a complaint for concealment seeking "a declaration that any transfer of cash or securities from the decedent to the Efstathiadis [appellants] is void and that such assets are included in the inventory of the decedent's estate." *Id.* at ¶ 2. It was alleged that less than a month before the decedent's death, the decedent gifted $10,000.00 each to the Efstathiadis by checks and also transferred shares of stock to the Efstathiadis. *Id.* at ¶ 3. The Efstathiadis had a confidential/fiduciary relationship with the decedent. Therefore, without explaining how or why, the trial court applied a presumption of undue influence regarding the validity of the decedent's inter vivos gifts. *Id.* The trial court determined that the Efstathiadis had not rebutted this presumption. *Id.*

**{¶51}** On appeal, this Court addressed whether the probate court had subject matter jurisdiction to entertain a concealment action where the asset was transferred before the creation of an estate. *Id.* at ¶ 5-6. We said that "'for an asset to belong to a probate estate, title to the asset must rest in the decedent upon her death. . . . If title to personal property resides in the decedent upon her death, title to that property passes over to the executor or administrator of the estate, . . . and the property can be properly considered "probate property" subject to'" a concealment proceeding under R.C. 2109.50.

Case No. 2025-P-0031

*Id.* at ¶ 7, quoting *Burns v. Daily*, 114 Ohio App.3d 693, 702 (11th Dist. 1996). On the other hand, where "'title does not reside in the decedent upon her death, but passed to a third party by *inter vivos* transaction or gift, then such property may not be included as an estate asset, and may not be retrieved by a summary proceeding in the probate court.'" (Emphasis in original.) *Id.*, quoting *Burns* at 702-703.

{¶52} However, we held (and created what can only be viewed as an exception to the aforementioned general rule) that the probate court does have jurisdiction over a concealment action "to recover funds passed to a third party by inter vivos transaction *where the validity of the underlying transfer is challenged*." (Emphasis added.) *Id.* at ¶ 8. Thus, "[r]esolution of this issue turns on the question of title . . . ." *Id.* at ¶ 9. That is to say, "whether the disputed assets belonged to the decedent at the time of his [or her] death." *Id.* We concluded the transfer of the cash and stock to the Efstathiadis was invalid because it was presumed to be the product of undue influence and the Efstathiadis had not rebutted the presumption. *Id.* Therefore, "ownership never passed from the decedent and these assets are properly part of the estate, albeit wrongfully withheld." *Id.*

{¶53} We noted that the result would have been different if the assets had been transferred by contract because "title would have passed upon payment to the payees." *Id.* at ¶ 11. Although the ability to recover such funds under a theory of fraud, conversion, breach of fiduciary duty, or breach of contract might be possible, such action would properly be pursued in the general division of the common pleas court, and the probate court would not have jurisdiction over such an action. *Id.* We reiterated that a concealment action under R.C. 2109.50 is not meant to be a substitute for an appropriate civil action. *Id.*, citing *Wozniak*, 90 Ohio App.3d at 407.

Case No. 2025-P-0031

{¶54}   In short, in *Rudloff* we did not abandon the general rules of law on the limits of a R.C. 2109.50 action. Indeed, we reiterated them and only recognized a narrow exception to them.

{¶55}   In her first assignment of error, Appellant acknowledges that she acted as Florence's attorney-in-fact prior to Florence's death and that R.C. 2109.50 sets forth the applicable proceeding to determine if she concealed or embezzled estate assets. However, she argues that Florence did not own the money in question at the time of her death because Appellant had spent all but $9,000.00 of it on Florence's care and other necessities. *See Mancz v. McHenry*, 2012-Ohio-3285 (2d Dist.); *In re Leiby's Estate*, 157 Ohio St. 374 (1952).

{¶56}   In *Leiby*, the administrator of an estate sought to have the bookkeeper for the decedent's company "account for discrepancies." *Mancz v. McHenry*, 2012-Ohio-3285, ¶ 35 (2d Dist.). However, the title to the money "was not in the decedent at the time of his death." *Id*. Therefore, "the proper vehicle for recovery of the monies from the bookkeeper" was a civil action outside the parameters of R.C. 2109.50 and 2109.52 involving property that was "taken from a decedent by a non-fiduciary, before the decedent's death." *Id.* at ¶ 36.

{¶57}   In *Mancz*, the decedent's daughter and attorney-in-fact (McHenry) funded her personal accounts with her mother's assets, and the assets were not used to benefit the decedent. *Id.* at ¶ 44. The evidence demonstrated that McHenry used the decedent's assets "to pay her mortgage, pay student loans, pay for her own health insurance, and other miscellaneous items that could not be traced as being for Kirby's benefit." *Id.* The underlying inter vivos transactions McHenry made were invalid because she made them

with money she had taken from the decedent and used for her own benefit. *Id.* at ¶ 51-52.

{¶58} Both cases comport with our holding in *Rudloff* and other Ohio authority. That is to say, concealment actions under R.C. 2109.50 and 2109.52 can be used to recover assets transferred inter vivos under circumstances that rendered the transfer invalid. Those assets are then treated as if they never left the ownership of the decedent and are counted as part of the estate; otherwise, R.C. 2109.50 and 2109.52 proceedings are improper. *See Rudloff*, 2003-Ohio-6686, at ¶ 11 (11th Dist.); *Goldberg v. Maloney*, 2006-Ohio-5485, ¶ 33-34; *Harrison*, 2004-Ohio-6808, at ¶ 30 (7th Dist.).

{¶59} Therefore, the essential jurisdictional question that we must resolve is whether Florence's assets were passed by an invalid inter vivos transaction and therefore should have been treated as part of her estate. If the answer to the question is negative, then the exception in *Rudloff* does not apply, and even though the trial court had subject matter jurisdiction, it nevertheless lacked jurisdiction over the particular case and did not have the authority to rule on the case. *See Kuchta*, 2014-Ohio-4275, at ¶ 18. We accept the trial court's factual findings but conclude that the trial court erred as a matter of law in finding that Appellant had unauthorized possession of Florence's assets or impermissibly disposed of them. Appellant did not receive any inter vivos transfer of assets from Florence. Instead, she acted as an attorney-in-fact pursuant to a valid POA. There was no evidence that the POA itself was invalid or that Appellant obtained her authority under the POA through fraudulent means or undue influence. The assets over which Appellant was granted the POA remained Florence's. There is no question that (1) Florence never transferred her assets to Appellant; (2) Florence never was declared incompetent; (3) no

Case No. 2025-P-0031

guardianship over Florence was ever established; and (4) all transfers occurred before Florence died.

{¶60} However poorly documented they may have been, the transfers that Appellant made all were made before there was an estate and were made, according to Appellant, for Florence's food, shelter, healthcare, eldercare, and other goods or services. If the Appellee had any reason to believe that Appellant received or disposed of Florence's assets through improper means, that is a question we do not address here and one that may yet be raised in a court of general jurisdiction.

{¶61} However, Appellee did not challenge the propriety of the POA and did not make a claim of undue influence over Florence. Nor did he challenge the underlying transactions by which Appellant spent the money on Florence's behalf. Appellee acknowledged that there was "a lot of truth" to Appellant's testimony and denied having any evidence or documentation to show that Appellant had concealed any assets. He even testified that he did not believe this matter was about hidden assets but was instead about Appellant's poor record keeping and lack of responsibility as attorney-in-fact. The preponderance of the evidence does not support a conclusion that any of the money that Appellant used for Florence during her lifetime should have been classified as the exclusive property of Florence's estate. *See In re Estate of Ohman*, 2023-Ohio-4008, ¶ at ¶ 40-41 (6th Dist.).

{¶62} Our conclusion rests on the premise that Florence's estate did not own the assets Appellee claims were the subject of concealment. Appellee was unable to prove that the inter vivos transfers were wrongful or fraudulent. Therefore, upon this lack of

Case No. 2025-P-0031

evidence, the exception in *Rudloff* did not apply, and the trial court lacked jurisdiction over the case "to proceed or rule." *See Kuchta*, 2014-Ohio-4275, ¶ 19.

{¶63} There may be a question of whether Appellant fulfilled or breached her fiduciary duty to Florence through imperfect record keeping. Nevertheless, she spent the funds pursuant to the authority granted by the POA. Florence's assets spent for her benefit during her life should not have been calculated as part of her estate. Any challenge to the transfers pursuant to that authority would not lie under a concealment claim but rather in the Court of Common Pleas, General Division.

{¶64} Therefore, the trial court erred in concluding that it had jurisdiction to determine this matter because the assets Appellee claimed were concealed were not the exclusive property of the estate upon Florence's death.

{¶65} Accordingly, Appellant's first assignment of error has merit.

{¶66} Appellant's second assignment of error states: "The Trial Court committed prejudicial error when it failed to provide any computation of damages."

{¶67} As we have already determined that the trial court lacked jurisdiction over the case, we need not address Appellant's second assignment of error.

{¶68} For the foregoing reasons, the judgment of the Portage County Court of Common Pleas, Probate Division, finding Appellant guilty of concealment and subsequently assessing damages and attorney fees is reversed. This matter is remanded for further proceedings consistent with this opinion.


ROBERT J. PATTON, J., concurs,

MATT LYNCH, P.J., concurs in judgment only with a Concurring Opinion.

Case No. 2025-P-0031

MATT LYNCH, P.J., concurs in judgment only with a Concurring Opinion.

{¶69} I disagree with the majority that appellees failed to challenge the validity of the transfers made by appellant while exercising her claimed authority as power of attorney for her mother. The Complaint recites the details of the challenged transactions and alleges appellant "concealed, embezzled, or conveyed away, or is or has been in the possession of certain monies, chattels, or other assets that belong to the estate of Florence Basel, deceased . . . ." The foregoing is sufficient to invoke the jurisdiction of the Probate Court. See *Rudloff v. Efstathiadis,* 2003-Ohio-6686, ¶ 8 (11th Dist.) (probate court has jurisdiction over an action to recover funds passed to a third party by inter vivos transaction where the validity of the underlying transfer is challenged); and *Burwell v. Rains*, 2005-Ohio-1893, ¶ 29 (11th Dist.) (probate court has concurrent jurisdiction to entertain action for concealed or embezzled assets pertaining to power of attorney issues). However, because appellees failed to produce sufficient evidence that appellant had actually "concealed, embezzled, or conveyed away" any assets, I agree with the majority's determination that the trial court's judgment should be reversed.

{¶70} Accordingly, I concur in judgment only.

Case No. 2025-P-0031

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, it is the judgment and order of this court that the judgment of the Portage County Court of Common Pleas, Probate Division, finding Appellant guilty of concealment and subsequently assessing damages and attorney fees is reversed. This matter is remanded to the trial court for further proceedings consistent with this opinion.

Costs to be taxed against Appellee.


_____
JUDGE JOHN J. EKLUND


_____
JUDGE ROBERT J. PATTON,
concurs


_____
PRESIDING JUDGE MATT LYNCH,
concurs in judgement only with a Concurring
Opinion

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case No. 2025-P-0031